1
2
3
4          UNITED STATES DISTRICT COURT
5          NORTHERN DISTRICT OF CALIFORNIA
6
7    COREY A. MITCHELL,                    Case No.  09-cv-04831-EMC
8              Petitioner,
9          v.                              ORDER DENYING PETITION FOR
                                           WRIT OF HABEAS CORPUS
10   ANTHONY HEDGPETH,
11             Respondent.
12
13                    I.    INTRODUCTION
14        Corey Mitchell filed this *pro se* action for a writ of habeas corpus pursuant to 28 U.S.C.

15   § 2254 to challenge his conviction in Alameda County Superior Court.  Respondent has filed an

16   answer to the petition and Mr. Mitchell has filed a traverse.  For the reasons discussed below, the

17   Court denies the petition.

18                    II.    BACKGROUND

19   A.    The Crimes

20        Mr. Mitchell was convicted of several counts of carjacking and related crimes.  The facts

21   of only two of the five carjacking episodes are relevant to the legal claims presented in the petition

22   for writ of habeas corpus.  The California Court of Appeal described those two criminal episodes:

23        B.    Janet Grossman (Counts 4-5)

24        On October 19, 2003, at about 4:30 p.m., Janet Grossman was on
          Hill Lane behind her home in Piedmont.  Her home had a detached
25        garage accessible from Hill Lane.  Grossman was leaving her garage
          and entering the garden area of her home when defendant
26        approached her.  He pointed a gun at her and said, "'Lady, I need the
          keys to your car.'"  Grossman said that she did not have the keys
27        with her.  Defendant repeated that he needed the keys and that he
          would shoot her if she did not give them to her.  She then
28        volunteered to get the keys and promised not to call the police.

United States District Court
For the Northern District of California

Defendant said he could not allow that and followed her into the house, pointing the gun at her. Her son, who was in the basement of the house, yelled out "'Mom'" when she entered the house. Grossman screamed at him to stay put and not to come upstairs. The distance from the garden to the house was about 70 feet. Once inside the pantry area of her kitchen, Grossman retrieved her car keys and handed them to defendant. Defendant fled in Grossman's Ford Explorer.

On October 24, 2003, Grossman viewed a photographic line-up. She said that a photograph of Shultz looked like the perpetrator except for the mustache, his eye color and his ears. On October 30, 2003, Grossman attended a physical lineup. She identified defendant as the perpetrator and also identified him at trial.

*   *   *

**E. Katherine Rice and Sarah Foster (Counts 12-14, 16)**

On October 27, 2003, Katherine Rice was returning to her Oakland home at approximately 5:15 p.m. She parked her Ford Expedition in the driveway. While she was still in the car, her partner, Sarah Foster, came over to the car and opened the passenger door. They talked while Foster leaned over the front seat and looked for something in the glove compartment. As they talked, Rice noticed two men walking toward the back of the car. Rice saw them continue walking toward the direction of 42nd Street. She continued to talk with Foster but then sensed someone at the driver's side window. Rice turned toward her window and saw defendant pointing a gun at her. Defendant told her to get out of the car. Rice got out of the car and was carrying her purse. As Rice got out of the car, Foster too backed away from it. Defendant demanded Rice's purse. Rice hesitated but gave it to him after he repeated his demand. Rice backed away and hid behind a neighbor's car. Defendant fled in the car. Foster called 911.

A high speed chase ensued. Defendant eventually crashed into a parked car at 33rd Street and Martin Luther King Jr. Way. He jumped out of the car and ran off. The police pursued defendant on foot and defendant was taken into custody within a few minutes.

The police later took Rice and Foster to make a field identification. Both identified defendant as the perpetrator. They also identified defendant at trial.

*People v. Mitchell*, Nos. A113501, A118946, 2008 WL 2898663, at *2-3 (Cal. Ct. App. 2008).

Mr. Mitchell does not assert any claims relating to the facts of three other carjacking episodes so they need only be mentioned briefly. First, on the morning of October 17, 2003, Mr. Mitchell hit Vance Goulart and took his car at gunpoint. *Id.* at *1-2. Second, on the afternoon of October 24, 2003, Mr. Mitchell shot Santos Cruz in the chest and took his minivan. *Id.* at *2. Third, on the afternoon of October 26, 2003, Mr. Mitchell took Marie Sylvestre's car at gunpoint.

2

*Id.* at 3.

B.       Procedural History

Following a jury trial in Alameda County Superior Court in 2006, Mr. Mitchell was convicted of six counts of carjacking, two counts of second degree robbery, three counts of possession of a firearm by a felon, kidnapping in the commission of a carjacking, assault with a semiautomatic firearm, and reckless driving while fleeing from a peace officer.  The jury also found true several sentence enhancement allegations.  On March 20, 2006, the court sentenced Mr. Mitchell to state prison for a term of 62 years to life.

Mr. Mitchell then filed a direct appeal and a petition for writ of habeas corpus.  The California Court of Appeal dismissed one count of carjacking and otherwise affirmed the judgment.  The California Court of Appeal denied Mr. Mitchell's petition for writ of habeas corpus.  In 2008, the California Supreme Court denied Mr. Mitchell's petition for review.

On October 9, 2009, Mr. Mitchell filed his federal petition for writ of habeas corpus.  The case was eventually stayed to allow Mr. Mitchell to exhaust state court remedies for an unexhausted claim.  Mr. Mitchell next went to the state courts, and presented that claim to exhaust it.  When he returned to federal court, respondent successfully moved to dismiss that now-exhausted claim as procedurally barred.  The following claims remain for adjudication:  (1) the evidence is insufficient to support the conviction of kidnapping in the commission of a carjacking in Count 4; (2) the evidence is insufficient to support the carjacking conviction in Count 13; and (3) the *Marsden* motions to substitute counsel were improperly denied.  Respondent has filed an answer, and Mr. Mitchell has filed a traverse.

### III.       JURISDICTION AND VENUE

This Court has subject matter jurisdiction over this action for a writ of habeas corpus under 28 U.S.C. § 2254.  28 U.S.C. § 1331.  This action is in the proper venue because the petition concerns the conviction and sentence of a person convicted in Alameda County, California, which is within this judicial district.  28 U.S.C. §§ 84, 2241(d).

### IV.       STANDARD OF REVIEW

This Court may entertain a petition for writ of habeas corpus "in behalf of a person in

1  custody pursuant to the judgment of a State court only on the ground that he is in custody in

2  violation of the Constitution or laws or treaties of the United States."  28 U.S.C. § 2254(a).

3      The Antiterrorism And Effective Death Penalty Act of 1996 ("AEDPA") amended § 2254

4  to impose new restrictions on federal habeas review.  A petition may not be granted with respect to

5  any claim that was adjudicated on the merits in state court unless the state court's adjudication of

6  the claim:  "(1) resulted in a decision that was contrary to, or involved an unreasonable application

7  of, clearly established Federal law, as determined by the Supreme Court of the United States; or

8  (2) resulted in a decision that was based on an unreasonable determination of the facts in light of

9  the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d).

10      "Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court

11  arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if

12  the state court decides a case differently than [the] Court has on a set of materially

13  indistinguishable facts."  *Williams (Terry) v. Taylor*, 529 U.S. 362, 412-13 (2000).

14      "Under the 'unreasonable application' clause, a federal habeas court may grant the writ if

15  the state court identifies the correct governing legal principle from [the Supreme] Court's

16  decisions but unreasonably applies that principle to the facts of the prisoner's case."  *Id.* at 413.

17  "[A] federal habeas court may not issue the writ simply because that court concludes in its

18  independent judgment that the relevant state-court decision applied clearly established federal law

19  erroneously or incorrectly.  Rather, that application must also be unreasonable."  *Id.* at 411.  "A

20  federal habeas court making the 'unreasonable application' inquiry should ask whether the state

21  court's application of clearly established federal law was 'objectively unreasonable.'"  *Id.* at 409.

22                    **V.    DISCUSSION**

23  A.    Sufficiency of the Evidence to Support the Kidnapping Conviction

24      Mr. Mitchell contends that his conviction of kidnapping during the commission of a

25  carjacking violates his due process rights because there was insufficient evidence to support the

26  conviction.  Specifically, he argues that the movement of Janet Grossman, the victim, was

27  incidental to the carjacking and that the kidnapping occurred before (rather than during) the

28  carjacking.

1.      The Crime of Kidnapping During The Commission of a Carjacking

California law provides for a sentence of life imprisonment with the possibility of parole for "[a]ny person who, during the commission of a carjacking and in order to facilitate the commission of the carjacking, kidnaps another person." Cal. Penal Code § 209.5(a). A kidnapping during the commission of a carjacking occurs only "if the movement of the victim is beyond that merely incidental to the commission of the carjacking, the victim is moved a substantial distance from the vicinity of the carjacking, and the movement of the victim increases the risk of harm to the victim over and above that necessarily present in the crime of carjacking itself." *Id.* at § 209.5(b).[1]

---

[1] At trial, the jury was instructed with CALCRIM pattern jury instructions – the adequacy of which Mr. Mitchell does not contest – which set out the requirements for carjacking and kidnapping for carjacking. The kidnapping instruction provided:

> To prove that the defendant is guilty of [kidnapping during a carjacking], the People must prove:
>
> 1. The defendant committed a carjacking;
>
> 2. During the carjacking, the defendant took, held, or detained another person by using force or by instilling reasonable fear;
>
> 3. The defendant moved the other person or made that person move a substantial distance from the vicinity of the carjacking;
>
> 4. The defendant moved or caused the other person to move with the intent to facilitate the carjacking;
>
> 5. The person moved was not one of the carjackers;
>
> AND
>
> 6. The other person did not consent to the movement.
> . . .
>
> As used here, 'substantial distance' means more than a slight or trivial distance. The movement must have been more than merely brief and incidental to the commission of the carjacking. The movement must also have substantially increased the risk of physical or psychological harm to the person beyond that necessarily present in the carjacking. In deciding whether the movement was sufficient, consider all circumstances relating to the movement.
>
> "Fear," as used in this instruction, means fear of injury to the person or injury to the person's family or property. It also means fear of

5

1    The asportation, or movement, requirement is similar for several types of aggravated

2    kidnapping in California, such as kidnapping for rape or robbery or kidnapping during the

3    commission of a carjacking.  *See People v. Bell*, 179 Cal. App. 4th 428, 436 (Cal. Ct. App. 2009);

4    Cal. Penal Code §§ 209, 209.5.  The jury must consider both whether the movement was more

5    than merely incidental to the crime and whether there was an increased risk of harm to the victim,

6    but these two "are not mutually exclusive, they are interrelated."  *People v. Shadden*, 93 Cal. App.

7    4th 164, 168 (Cal. Ct. App. 2001).  As to whether the movement was more than merely incidental

8    to the commission of the underlying crime in an aggravated kidnapping, such as kidnapping

9    during the commission of a carjacking, "the jury considers the scope and nature of the movement,

10   which includes the actual distance a victim is moved.  There is, however, no minimum distance a

11   defendant must move a victim to satisfy" this element.  *People v. Simmons*, 233 Cal. App. 4th

12   1458, 1471 (Cal. Ct. App. 2015) (internal quotation marks omitted).  "As to whether the

13   movement increased a victim's risk of harm, the jury considers such factors as the decreased

14   likelihood of detection, the danger inherent in a victim's foreseeable attempts to escape, and the

15   attacker's enhanced opportunity to commit additional crimes."  *Id.* (internal quotation marks

16   omitted).  *See, e.g., People v. Dominguez*, 39 Cal. 4th 1141, 1151-52 (Cal. 2006)  (asportation

17   element of kidnapping-for-rape satisfied where the victim was moved about 25 feet from the

18   shoulder of the road, down an embankment and partially into an orchard about 10-12 feet lower

19   than the road's surface); *People v. Rayford*, 9 Cal. 4th 1, 23 (Cal. 1994) (asportation element

20   satisfied where evidence showed rapist-defendant forcibly moved victim "105 feet at night from

21   the parking lot of a closed store to the other side of a wall located at the edge of the lot" where she

22   was outside the view of passers-by); *Shadden*, 93 Cal. App. 4th at 170 (asportation element of

23   kidnapping-for-rape satisfied where victim was moved nine feet, from front counter of store to a

24   small back room where she would be out of public view and which "made it less likely for others

25   to discover the crime and decreased the odds of detection").

26

27            immediate injury to another person present during the incident or to
             that person's property.

28   CT 840-41 (CALCRIM 1204 (2006 version)); *see* Cal. Penal Code § 209.5.

**United States District Court**
For the Northern District of California

2.      California Court of Appeal Decision

The California Court of Appeal rejected Mr. Mitchell's challenge to the sufficiency of the evidence to support his conviction of kidnapping during the commission of a carjacking. The state appellate court noted that, in reviewing the sufficiency of the evidence to support a conviction, a court must view the record in the light most favorable to the judgment and then must decide whether that record discloses substantial evidence, such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. *Mitchell*, at *6.

> Here, the evidence showed that defendant forced Grossman at gunpoint to move from her garden to the inside of her home, a distance of approximately 70 feet. The asportation not only caused her to move from a place where she might have been seen by her neighbors, it increased the risk of harm to her and that of her son who, unbeknownst to defendant, was in the home. Moreover, the kidnapping was not merely incidental to the carjacking as Grossman had volunteered to get her keys. (*See People v. Shadden* (2001) 93 Cal.App.4th 164, 168-169, 112 Cal.Rptr.2d 826 [movement that is neither part of nor necessary to the offense is not incidental to the crime].) The jury could, thus, reasonably infer that the movement was substantial and not incidental to the carjacking. (*People v. Smith* (1995) 33 Cal.App.4th 1586, 1593-1594, 40 Cal.Rptr.2d 31 [movement that changes victim's environment does not have to be great in distance to be substantial].)
>
> Relying on *People v. Moore* (1999) 75 Cal.App.4th 37, 88 Cal.Rptr.2d 914, defendant argues that the kidnapping in the commission of a carjacking offense requires that the asportation occur or continue after the carjacking is complete. *Moore* does not so hold. Rather, the *Moore* court was concerned with the definition of substantial distance in the asportation requirement of section 209.5. The court held that the trial court properly instructed the jury that a substantial distance from the vicinity of a carjacking is a distance that is more than slight, brief or trivial. (*Moore*, at p. 46, 88 Cal.Rptr.2d 914.) The *Moore* court concluded that "'any point within the "vicinity" of the carjacking was a sufficient starting point for the calculation of whether the victim was moved a "substantial distance."'" (*Ibid*.) Here, there is no question that Grossman was moved a substantial distance-70 feet-from the vicinity of the carjacking. Defendant's challenge to the sufficiency of the evidence to support his conviction of the offense therefore fails.

*Mitchell*, at *7.

3.      Analysis of Due Process Claim

The Due Process Clause "protects the accused against conviction except upon proof beyond a reasonable doubt of every fact necessary to constitute the crime with which he is

7

charged." *In re Winship*, 397 U.S. 358, 364 (1970). A federal court reviewing collaterally a state court conviction does not determine whether it is satisfied that the evidence established guilt beyond a reasonable doubt, but rather determines whether, "after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). Only if no rational trier of fact could have found proof of guilt beyond a reasonable doubt may a court conclude that the evidence is insufficient. *See Jackson*, 443 U.S. at 324. The "prosecution need not affirmatively 'rule out every hypothesis except that of guilt,'" and the reviewing federal court "'faced with a record of historical facts that supports conflicting inferences must presume – even if it does not affirmatively appear in the record – that the trier of fact resolved any such conflicts in favor of the prosecution, and must defer to that resolution.'" *Wright v. West*, 505 U.S. 277, 296-97 (1992) (quoting *Jackson*, 443 U.S. at 326).

The Ninth Circuit has explained that "'[c]ircumstantial evidence and inferences drawn from it may be sufficient to sustain a conviction.' Nevertheless, 'mere suspicion or speculation cannot be the basis for creation of logical inferences.'" *Walters v. Maass*, 45 F.3d 1355, 1358 (9th Cir. 1995) (citations omitted). "*Jackson* leaves juries broad discretion in deciding what inferences to draw from the evidence presented at trial, requiring only that jurors 'draw reasonable inferences from basic facts to ultimate facts.'" *Coleman v. Johnson*, 132 S. Ct. 2060, 2064 (2012) (per curiam) (citing *Jackson*, 443 U.S. at 319). "[O]n habeas review, a federal court may not overturn a state court decision rejecting a sufficiency of the evidence challenge" unless "the state court decision was objectively unreasonable." *Id.* at 2062 (internal quotation marks omitted).

The California Court of Appeal's rejection of Mr. Mitchell's challenge to the sufficiency of the evidence was not contrary to, or an unreasonable application of clearly established federal law, as set forth by the U.S. Supreme Court. The state appellate court identified the correct legal standard and reasonably applied it.

The California Court of Appeal reasonably determined that the evidence was sufficient to support the jury's determination that the movement of Ms. Grossman was beyond that merely incidental to the commission of the carjacking and increased the risk of harm to her. Ms.

**United States District Court**
For the Northern District of California

1    Grossman described her property as including a house, a path leading from the house to a detached

2    garage, and a garden adjacent to the detached garage.  One accessed the garage and garden from

3    Hill Lane, a quiet thoroughfare.  RT 299-301.  Ms. Grossman testified that Mr. Mitchell forced her

4    at gunpoint to move about 70 feet, and to move to inside her house from her garden, which was

5    next to her garage or carport.  RT 315 (the distance from the area she was in when confronted to

6    the kitchen pantry where the keys were was about 70 feet); RT 316 (Ms. Grossman did not move

7    or allow Mr. Mitchell in her house in the exercise of her own free will); RT 316 (Ms. Grossman

8    thinks Mr. Mitchell kept the gun pointed at her as she walked in front of him to the house).  Ms.

9    Grossman's testimony would allow a reasonable jury to view that movement as increasing the risk

10   of danger to her, as she was initially in a place where she (with her kidnapper) could be seen by

11   neighbors and passers-by.  *See* RT 309 (Ms. Grossman stalled for time, hoping that a neighbor

12   would see them); RT 309 ("it's very typical on a warm afternoon for people to be gardening or

13   doing other things in the backyard, and I was -- with the [garage] door wide open, I was hoping

14   that somebody would come down Hill Lane, would see this man holding a gun at me, or would

15   just notice that something wasn't right").  Once she was made to go in the house by Mr. Mitchell's

16   threat of force, her opportunity to be detected and rescued by a neighbor or passerby decreased.

17   Ms. Grossman's 13-year-old son was in the house, but Ms. Grossman's testimony indicates she

18   thought of him as someone to be protected, rather than someone who would rescue her.  See RT

19   308 (her 13-year-old son was at home working on a computer in the recreation room in the

20   basement); RT 314, 338 (she swung the pantry door open to slow any potential entry into the

21   kitchen by her son); RT 314 (after her son called out "Mom" when she entered, she "screamed for

22   him to stay put and not to come upstairs"); RT 313 ("I didn't know if [defendant] was going to just

23   leave, or if he was going to shoot me, or harm my child that was home").  *Cf. People v. Simmons*,

24   233 Cal. App. 4th 1458, 1472 (Cal. Ct. App. 2015) (asportation element satisfied for kidnapping-

25   for-robbery convictions where two victims were forced to walk back up the stairs outside the

26   house and into the house to be robbed because the movement "decreased the likelihood the

27   defendants would be detected and increased the victims' risk of harm" once in the house); *People*

28   *v. Robertson*, 208 Cal. App. 4th 965, 984 (Cal. Ct. App. 2012) (movement of the victim from the

9

**United States District Court**
For the Northern District of California

1   back of the garage by a door to the front of the garage next to a large tub of water, which led

2   victim to fear being drowned if she resisted, "was not merely incidental and increased the victim's

3   risk of physical and psychological harm above the risk inherent in the crime of rape").

4        The jury also reasonably could have determined that the kidnapping was not merely

5   incidental to the carjacking because Mr. Mitchell could have accomplished the carjacking without

6   the kidnapping.  For example, Mr. Mitchell could have retrieved the keys himself while letting

7   Ms. Grossman remain in the garden or he could have let her go to get the keys while he waited in

8   the garden.  *See* RT 313 ("I asked him if I could -- in fact, I think I begged him.  I said, 'Please,

9   my keys are inside the house.  I'll go back and get you the keys.  I won't call the police.  You can

10  leave.'  [¶]  And he said, No, he couldn't do that."); RT 314 (Ms. Grossman told him she did not

11  want him in the house).  The California Court of Appeal reasonably relied on Mr. Mitchell's

12  decision to escort the victim back to her house at gunpoint as evidence that the kidnapping was not

13  merely incidental to the carjacking.

14       The forced movement of Ms. Grossman about 70 feet from the place where Mr. Mitchell

15  first demanded the keys changed Ms. Grossman's environment from a relatively open area to a

16  place significantly more secluded, decreasing the possibility of detection, escape or rescue.  As the

17  appellate court reasonably concluded, the jury could find that this compelled movement increased

18  the risk of harm to Ms. Grossman, decreased the risk of detection, and provided enhanced

19  opportunities for Mr. Mitchell to commit additional crimes.  *See People v. Martinez*, 20 Cal. 4th

20  225, 236-37 (Cal. 1999) ("kidnaps" "has been interpreted to require consideration of the 'scope

21  and nature' of the movement and the increased risk of harm to the victim;" nothing "limits the

22  asportation element solely to actual distance"); *Shadden,* 93 Cal. App. 4th at 169-70 (moving

23  victim nine feet was sufficient to satisfy the asportation element of kidnapping to commit rape,

24  where victim was moved from the retail area of the store to a back room).

25       There is no merit to Mr. Mitchell's argument that the kidnapping was not committed

26  during the carjacking because it took place before the carjacking.  "The intent that the kidnapping

27  facilitate the carjacking must be present when the original asportation began."  *People v. Ortiz*,

28  208 Cal. App. 4th 1354, 1365 (Cal. Ct. App. 2012).  Here, there was ample evidence that would

United States District Court
For the Northern District of California

1  allow a jury to so find:  Mr. Mitchell approached Ms. Grossman with a gun, asked for her car

2  keys, and only demanded that Ms. Grossman move to her house after she told him that the keys to

3  the car were in the house.  She only walked to the house after Mr. Mitchell demanded that she get

4  the keys to her car and followed behind her with a gun.  From this evidence, a rational jury could

5  have concluded that Mr. Mitchell kidnapped Ms. Grossman to obtain her keys with the intent to

6  take her vehicle and accomplish the carjacking.

7          Viewing the evidence in the light most favorable to the prosecution and drawing the

8  reasonable inferences therefrom in the prosecution's favor, a rational trier of fact could have

9  concluded that Mr. Mitchell's movement of Ms. Grossman was more than incidental to the

10  carjacking and was done during the commission of the carjacking offense.  The California Court

11  of Appeal's rejection of the challenge to the sufficiency of the evidence to support the conviction

12  of kidnapping during the commission of a carjacking was not an unreasonable application of

13  *Jackson*.  Mr. Mitchell is not entitled to the writ on this claim.

14  B.      Sufficiency of the Evidence to Support the Conviction For Carjacking Ms. Foster

15          Mr. Mitchell contends that his right to due process was violated because the evidence was

16  insufficient to support his conviction of carjacking Sarah Foster.  Specifically, he contends that

17  Ms. Foster could not be the victim of the carjacking because she was not the driver, not a

18  passenger, and not in possession of the vehicle when it was taken at gunpoint.

19          1.      Background

20          Under California law, carjacking is "the felonious taking of a motor vehicle in the

21  possession of another, from his or her person or immediate presence, or from the person or

22  immediate presence of a passenger of the motor vehicle, against his or her will and with the intent

23  to either permanently or temporarily deprive the person in possession of the motor vehicle of his

24  or her possession, accomplished by means of force or fear."  Cal. Penal Code § 215(a).[2]

25  _____

26  [2] The jury was instructed on the offense of carjacking, as follows:

27          To prove that the defendant is guilty of [carjacking], the People
        must prove that:

28          1. The defendant took a motor vehicle that was not his own;

United States District Court
For the Northern District of California

The California Court of Appeal rejected Mr. Mitchell's claim that the evidence was insufficient to support the conviction for carjacking Ms. Foster.

> Contrary to defendant's contention, there was substantial evidence that Foster was a passenger in the Expedition. The evidence showed that as defendant approached to carjack the car, Foster was leaning over the front seat of the passenger's side of the car talking with Rice, who was in the driver's seat, and looking for something in the glove compartment. That she was not seated in the car is not dispositive. It is well settled that a carjacking does not require that the victim be inside or touching the vehicle at the time of the taking. (*People v. Coleman* (2007) 146 Cal.App.4th 1363, 1373, 53 Cal.Rptr.3d 505; *see also People v. Coryell* (2003) 110 Cal.App.4th 1299, 2 Cal.Rptr.3d 477 (*Coryell*) [passenger who fled from a car after witnessing confrontation between driver and defendant at a phone booth was a victim of subsequent carjacking].) Here, the evidence that Foster was leaning into the car at the time of the carjacking supported the finding that she was a passenger within the meaning of the carjacking statute. Moreover, as a passenger, she had sufficient possession of the vehicle to be a victim of the carjacking. (*Coryell, supra*, 110 Cal.App.4th at p. 1304, 2 Cal.Rptr.3d 477 [passenger in automobile has ostensible control over it to be in possession of the vehicle for purposes of carjacking statute].)

---

> 2. The vehicle was taken from the immediate presence of a person who possessed the vehicle or was its passenger;
>
> 3. The vehicle was taken against that person's will;
>
> 4. The defendant used force or fear to take the vehicle or to prevent that person from resisting; AND
>
> 5. When the defendant used force or fear to take the vehicle, he intended to deprive the other person of possession of the vehicle either temporarily or permanently.
>
> . . .
>
> Two or more people may possess something at the same time.
>
> "Fear," as used here, means fear of injury to the person himself or herself or immediate injury to someone else present during the incident or to that person's property.
>
> A vehicle is within a person's "immediate presence" if it is sufficiently within his or her control so that he or she could keep possession of it if not prevented by force or fear.

CT 837-38 (CALCRIM 1650 (2006 version)); *see* Cal. Penal Code § 215.

1    *Mitchell*, at *8.

2          2.    Analysis

3          As mentioned in Section A.3, above, a court reviewing a challenge to the sufficiency of the

4    evidence to support a conviction must decide whether, "after viewing the evidence in the light

5    most favorable to the prosecution, *any* rational trier of fact could have found the essential elements

6    of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. at 319.  This being a

7    federal habeas action reviewing a state court conviction, relief is available only if the state court's

8    rejection of the sufficiency of the evidence challenge was "objectively unreasonable." *Coleman v.*

9    *Johnson*, 132 S. Ct. at 2062.  The California Court of Appeal's decision was not objectively

10   unreasonable.

11         Unlike robbery, which requires a taking from the person or immediate presence of the

12   possessor, a carjacking can occur when the vehicle is taken from the person or immediate presence

13   of either the possessor or any passenger.  *See People v. Hill*, 23 Cal. 4th 853, 860 (Cal. 2000).  A

14   vehicle is within a person's immediate presence for purposes of § 215(a) "if it is so within his

15   reach, inspection, observation or control, that he could, if not overcome by violence or prevented

16   by fear, retain his possession of it."  *People v. Johnson,* 60 Cal. 4th 966, 989 (Cal. 2015) (internal

17   quotation marks omitted).  A passenger need not have a possessory interest to be a victim of a

18   carjacking.  *Hill*, 23 Cal. 4th at 860; *e.g., id.* at 860-61 (upholding two carjacking convictions; one

19   conviction for the carjacking of the mother who possessed the car and another conviction for the

20   carjacking of the infant in the car); *People v. Hamilton*, 40 Cal. App. 4th 1137, 1144 (Cal. Ct.

21   App. 1995) (upholding two carjacking convictions where armed defendant approached husband

22   and wife, who were standing outside their car from which they had just exited).  California law

23   also "does not require that the victim be inside or touching the vehicle at the time of the taking"

24   for a carjacking to occur.  *People v. Coryell*, 110 Cal. App. 4th 1299, 1303 (Cal. Ct. App. 2003)

25   (passenger, who fled from the car after witnessing a vicious attack on the driver, was also a victim

26   of carjacking); *People v. Mora*, 2007 WL 1982264, at *2-3 (Cal. Ct. App. 2007) (unpublished

27   decision) (upholding three carjacking convictions; two children had raced ahead of their father and

28   were about to enter the car when defendant appeared with a gun, told them to "get back," pointed

13

**United States District Court**
For the Northern District of California

1   the gun at their father, took the car keys and fled in the car); *People v. Aguirre*, 2008 WL

2   4983004, *11 (Cal. Ct. App. 2008) (unpublished decision) (upholding carjacking conviction as to

3   victim who was robbed outside a taxi and told to walk away before the taxi was taken).

4       Mr. Mitchell identifies no California case holding that one's status as a passenger in a car

5   for purposes of carjacking is contingent on that person having travelled, or planning to travel, any

6   amount of distance in the vehicle.  The California Court of Appeal relied on Ms. Foster's physical

7   location (i.e., halfway in the vehicle) to determine that she was a passenger and implicitly

8   determined that California law did not define a passenger based on the distance travelled or to be

9   travelled for purpose of carjacking.  A state court's interpretation of state law, including one

10  announced on direct appeal of the challenged conviction, binds a federal court sitting in habeas

11  corpus.  *See Bradshaw v. Richey*, 546 U.S. 74, 76 (2005); *Hicks v. Feiock*, 485 U.S. 624, 629

12  (1988).  Thus, this court accepts that the law of California is that a person need not travel or intend

13  to travel any distance before being a passenger within the meaning of the carjacking statute,

14  California Penal Code § 215.

15      The California Court of Appeal's rejection of the challenge to the sufficiency of the

16  evidence to support this carjacking conviction was not an unreasonable application of *Jackson v.*

17  *Virginia.*  The evidence supported a finding that Ms. Foster was a passenger of the vehicle at the

18  time Mr. Mitchell took it at gunpoint.  She was physically partially in the car when Mr. Mitchell

19  pointed a gun at the driver and took the car.  Ms. Foster testified she had "opened the passenger

20  door, and was going through the glove compartment."  RT 604.  With the door opened, she "was

21  leaning in over the front seat" and talking with the driver, Ms. Rice.  RT 605, 640; *see also* RT

22  655 (Ms. Rice's testimony that Ms. Foster "went to the passenger's side -- the front passenger's

23  side, opened the door, and we talked, and then looked for something in the glove box that she

24  needed").  When Ms. Foster backed away from the car after Mr. Mitchell demanded the car from

25  the driver, the passenger side door remained open as Mr. Mitchell backed out of the driveway and

26  sped away in the car with the passenger door still open.  RT 610-11, 647.

27      In light of the evidence presented at trial, a rational trier of fact could have found that Ms.

28  Foster was a passenger in the car, and that Mr. Mitchell had committed the crime of carjacking

14

United States District Court
For the Northern District of California

1   against her.  The California Court of Appeal's rejection of Mr. Mitchell's challenge to the

2   sufficiency of the evidence on this count was not an unreasonable application of *Jackson v.*

3   *Virginia*.

4          A rational jury also could have found that Ms. Foster had a possessory interest in the car,

5   although it is not necessary for a passenger to have a possessory interest to be a carjacking victim.

6   The California Court of Appeal linked possessory interest with passenger status, but passenger

7   status is not necessary to possessory interest.  The language of the statute makes it a crime to take

8   a vehicle from the possessor or a passenger, or both.  *See Hill*, 23 Cal. 4th at 860.  Regardless of

9   her status as a passenger, the evidence amply supported a finding that she was a possessor of the

10  car.  Ms. Foster was not a mere bypasser who walked by a car that happened to be in the midst of

11  being taken.  Ms. Foster was the owner of the car.  RT 619.  The carjacking took place as Ms.

12  Foster was looking through the glove compartment in search of a car registration and proof of

13  insurance for an appointment she had the next day.  RT 604 ("I . . . was going through the glove

14  compartment, because I had an appointment on Coast Guard Island the following day, and I had to

15  have proof of registration -- I mean registration and proof of insurance, and I wanted to make sure

16  those documents were in fact in the glove compartment.")  Although Mr. Mitchell directed his

17  attention at the driver and did not point the gun at Ms. Foster, the driver was Ms. Foster's

18  girlfriend, and the gun was pointed at her girlfriend's face when Mr. Mitchell said "get out of the

19  car."  RT 608-09, 636 ("he had a gun in my girlfriend's face").  And Ms. Foster had to back away

20  from the car, or would have been hit by, or carried away in, it as Mr. Mitchell had to back out of

21  the driveway before speeding away.  With regard to the charge that Mr. Mitchell had committed a

22  carjacking against Ms. Foster, a rational trier of fact could have concluded that the vehicle "was

23  taken from the immediate presence of a person who possessed the vehicle" when the evidence

24  showed that Ms. Foster was the owner of the vehicle, Ms. Foster had the door open and was

25  leaning into the vehicle, and Ms. Foster had to back away from the car to avoid being taken away

26  with it at Mr. Mitchell backed out of the driveway before driving away.  The evidence was

27  sufficient to support the conviction.   Mr. Mitchell is not entitled to the writ on this claim.

28

1    C.    <u>Claim of Wrongful Denial of *Marsden* Motions</u>

2          Mr. Mitchell contends that his Sixth Amendment right to counsel was violated when the

3  trial court denied his four *Marsden*[3] motions against his appointed counsel, Barbara Thomas.  Ms.

4  Thomas was Mr. Mitchell's second appointed counsel, having been appointed after Frank Lang

5  had been allowed to withdraw.  Before withdrawing, Mr. Lang had represented Mr. Mitchell for

6  about two years, during which Mr. Lang had worked on the case with his investigator.  *See* Docket

7  No. 33-2 at 32 (12/12/05 RT 29-30).

8      1.    <u>Background</u>

9          Attorney Frank Lang was appointed to represent Mr. Mitchell on December 4, 2003.  More

10 than eighteen months into that relationship, Mr. Mitchell filed a *Marsden* motion against Mr.

11 Lang.  The superior court denied that motion on August 10, 2005.  (Mr. Mitchell does not

12 challenge the denial of that *Marsden* motion.)  Mr. Lang later moved to withdraw as counsel

13 because Mr. Mitchell had lost "confidence in him and wanted him to be replaced, that he

14 [Mitchell] was refusing to speak to [Lang], and that they disagreed over how the defense of the

15 matter should be handled."  *Mitchell*, at *3.  Eventually -- and to the dismay of Mr. Mitchell, who

16 by then wanted to keep Mr. Lang as his counsel – Mr. Lang's motion to withdraw was granted on

17 October 20, 2005, and attorney Barbara Thomas was appointed as Mr. Mitchell's new attorney.

18         Mr. Mitchell was unhappy with Ms. Thomas' appointment.  Mr. Mitchell later explained

19 that he did not want Ms. Thomas to take the case because he thought he had a valid claim against

20 attorney Lang that would allow him to get any eventual conviction overturned.  *See* 11/22/05 RT 4

21 ("I told her if she takes my case right now it's going to hurt my case just for the fact that . . .  if I

22 was convicted, I was for sure going to get it overturned because I have paperwork on Mr. Lang,

23 but anyway, and so I told her at that time she was going to hurt my case if she took my case."); *see*

24 *also id.* at 12 ("When I asked her not to take the case . . . .  I honestly don't want her as my

25 lawyer.")  Although the court and counsel contemplated that the case file would be turned over to

26

27 _____

28 [3] *People v. Marsden*, 2 Cal. 3d 118 (1970), requires the California trial court to permit a criminal defendant requesting substitution of counsel to specify the reasons for his request and generally to hold a hearing.

United States District Court
For the Northern District of California

Ms. Thomas immediately upon her appointment on October 20, 2005, Ms. Thomas did not receive

the case file until two weeks later.  *See* Docket No. 33 at 10-11 (10/20/05 RT 18-19).

> Defendant brought his first *Marsden* motion against Thomas on November 22, 2005. He argued that Thomas had not talked to him about the case and was not qualified to represent him. Thomas explained to the court that Lang did not provide her with the discovery in the case until November 3, 2005, that she was learning the case and reviewing approximately 2,000 pages of documents, and creating her motions in limine, witness list and jury instructions. She also remarked that she understood the prosecution intended to take six weeks to present its case so that she would have plenty of time as the case unfolded to meet with defendant. The trial court denied the motion, finding that the *Marsden* motion was premature. The court, however, ordered that Thomas meet with defendant immediately.

> On December 12, 2005, defendant brought a second *Marsden* motion contending that Thomas failed to meet with him, refused to communicate with him and had not filed motions critical to his defense. He acknowledged that Thomas had met with him in a visiting booth at the jail where they communicated by telephone. He argued, however, that he needed a contact visit. He also argued that he wanted Thomas to file certain motions. Thomas explained to the court that she visited defendant on November 25, 2005, and that she was not able to schedule a contact visit for that date given the short notice. She said that Thomas refused to give her a list of things he wanted her to do. She told defendant that his motions were not viable on the facts. As she was explaining the various pros and cons of the things defendant wanted her to do, defendant became angry and left the visiting room. Thomas later spoke with Lang about the motions and learned that he had the same discussions with defendant during the two years he represented him, so she opined that "it's not so much what I say, it's just I'm the bearer of bad news and I can't change the law." She also stated that she offered to meet with defendant after the hearing but that he did not want to meet with her in the jail upstairs or to talk on the phone or to write. The court denied the motion, but admonished Thomas to make more efforts to talk with defendant.

> Defendant made a third *Marsden* motion by letter on December 20, 2005. The trial court denied the motion, reasoning that defendant was not raising anything new since his last hearing.

> On January 3, 2006, defendant brought his fourth *Marsden* motion. Defendant argued that Thomas had not visited him since the last *Marsden* hearing in December. Thomas explained that she offered to meet with defendant after the hearing on December 20, 2005, but that he refused. She told him that she could come out to the Santa Rita jail but that she could not arrange a contact visit. She wrote to him and asked him to provide her with a list of witnesses. She also attempted to arrange a contact visit to no avail since no one would answer the telephone at the jail. The court denied the motion, noting the difficulty in arranging contact visits in Santa Rita, and that

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

defendant still had time to consult with her because it would be over two weeks before the defense had to present its case.

*Mitchell,* at *4.

The California Court of Appeal rejected Mr. Mitchell's claim that the trial court had violated his state and federal rights by denying his several *Marsden* motions.

> A defendant has a right to substitute counsel upon a showing that his constitutional right to counsel would otherwise be substantially impaired. (*Marsden, supra,* 2 Cal.3d at p. 123, 84 Cal.Rptr. 156, 465 P.2d 44.) A defendant is entitled to substitute counsel if the record clearly shows that his counsel is not providing competent representation or that the defendant and counsel are embroiled in such an irreconcilable conflict that ineffective representation is likely to result. (*People v. Barnett* (1998) 17 Cal.4th 1044, 1085, 74 Cal.Rptr.2d 121, 954 P.2d 384.) "A trial court is not required to conclude that an irreconcilable conflict exists if the defendant has not made a sustained good faith effort to work out any disagreements with counsel and has not given counsel a fair opportunity to demonstrate trustworthiness." (*People v. Crandell* (1988) 46 Cal.3d 833, 860, 251 Cal.Rptr. 227, 760 P.2d 423.) We review a trial court's denial of a *Marsden* motion for abuse of discretion. (*People v. Smith* (1993) 6 Cal.4th 684, 690-691, 25 Cal.Rptr.2d 122, 863 P.2d 192 (*Smith*).)
>
> Defendant argues that the trial court abused its discretion because it did not hold a hearing after receiving his letter of December 20, 2005. As defendant acknowledges, in *People v. Wharton* (1991) 53 Cal.3d 522, 580, 280 Cal.Rptr. 631, 809 P.2d 290, our Supreme Court held that where the defendant, in a detailed letter to the court, explains the reasons for his dissatisfaction with counsel in sufficient detail, the court is not required to conduct a hearing. Here, as in *Wharton*, defendant's letter apprised the court of his complaints about Thomas. In any event, defendant was given an additional opportunity to discuss his issues with counsel shortly thereafter during the hearing on his fourth *Marsden* motion on January 3, 2006. No error appears.
>
> Defendant also argues the record shows that Thomas never had a "private conversation" with him, and that they became embroiled in an irreconcilable conflict. The record, however, demonstrates that Thomas met with defendant several days after the first *Marsden* hearing. While it was not a contact visit, Thomas discussed the case with defendant, and explained the pros and cons of the various motions he wished to make. Defendant, however, became angry and terminated the visit. As Thomas explained to the court during the second *Marsden* hearing, she asked Lang, defendant's former counsel, about the motions and "he ... indicated that he had all of these discussions with Mr. Mitchell earlier and that he had gone over everything that I had gone over, such as the standing issue and the 1538, such as the Pitchess information.... [H]e'd gone over those items with Mr. Mitchell in detail during the two years that he represented him." And, Thomas informed the court that she offered to meet with defendant at the jail after the second *Marsden* hearing,

but he indicated that he did not want to talk at the upstairs jail, insisting instead on a contact visit at the Santa Rita jail.

Hence, this is not a case where defendant did not have an opportunity to discuss his case with his attorney, but rather one where defendant could have made more use of the time his counsel had to talk with him about the case. By the time of trial in mid-December 2005, defendant's case had been pending for more than two years, and the case was proceeding on a "no-time-waiver." Thomas, who was substituted as counsel on October 20, 2005, was under a time constraint to prepare the case for trial, and even with the limited time available made numerous attempts to communicate with defendant. Defendant, however, stifled Thomas's attempts to discuss the case further.

The trial court did not abuse its discretion in denying the *Marsden* motions. The record shows that Thomas was a competent and experienced attorney. As the Seventh Circuit Court of Appeals recognized, "[w]e know of no case establishing a minimum number of meetings between counsel and client prior to trial necessary to prepare an attorney to provide effective assistance of counsel...." (*United States ex rel. Kelba v. McGinnis* (7th Cir.1986) 796 F.2d 947, 954.) While it might have been optimal for Thomas to have met with defendant more frequently prior to trial, the trial court accepted Thomas's explanation; and we cannot conclude that defendant was entitled to a substitution of counsel on that basis.

The California Supreme Court has cautioned trial courts to substitute counsel only when necessary--that is, only when the record clearly shows that counsel is not providing competent representation or that the defendant and counsel are embroiled in such an irreconcilable conflict that ineffective representation is likely to result. (*Smith, supra,* 6 Cal.4th at p. 696, 25 Cal.Rptr.2d 122, 863 P.2d 192.) Here, the trial court inquired into defendant's dissatisfaction with counsel at several hearings; the court was entitled to accept counsel's explanations for her actions. To the extent defendant complained about counsel's failure to meet with him before trial, the record shows that Thomas did meet with him and made several efforts to meet again prior to trial but that defendant declined to meet. It is well settled that "a defendant may not force the substitution of counsel by his own conduct that manufactures a conflict." (*Ibid.*) On this record, the trial court did not abuse its discretion in denying defendant's *Marsden* motions.

*Mitchell*, at *5-6.

## 2.   Analysis

The Sixth Amendment grants criminal defendants who can afford to retain counsel a qualified right to hire counsel of their choice. *See Wheat v. United States*, 486 U.S. 153, 159, 164 (1988).  A criminal defendant who cannot afford to retain counsel has no right to counsel of his own choosing.  *See id.*  Nor is he entitled to an attorney who likes and feels comfortable with him.

United States District Court
For the Northern District of California

The Sixth Amendment guarantees effective assistance of counsel, not a "meaningful relationship" between an accused and his counsel. *See Morris v. Slappy*, 461 U.S. 1, 14 (1983). The essential aim is "to guarantee an effective advocate for each criminal defendant rather than to ensure that a defendant will inexorably be represented by the lawyer whom he prefers." *Wheat,* 486 U.S. at 159. Nonetheless, to compel a criminal defendant to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive the defendant of counsel. *Daniels v. Woodford*, 428 F.3d 1181, 1197 (9th Cir. 2005). "[N]ot every conflict or disagreement between the defendant and counsel implicates Sixth Amendment rights." *Schell v. Witek*, 218 F.3d 1017, 1027 (9th Cir. 2000) (en banc).[4] The "ultimate constitutional question" on federal habeas review is whether the state trial court's denial of the *Marsden* motion "actually violated [the defendant's] constitutional rights in that the conflict between [the defendant] and his attorney had become so great that it resulted in a total lack of communication or other significant impediment that resulted in turn in an attorney-client relationship that fell short of that required by the Sixth Amendment." *Schell,* 218 F.3d at 1026.

Under circuit precedent, the superior court must make an inquiry when a criminal defendant moves to substitute counsel based on an irreconcilable conflict with counsel. *See Stenson v. Lambert*, 504 F.3d 873. 886-87 (9th Cir. 2007). There is no U.S. Supreme Court precedent on the procedural steps that must be taken when a criminal defendant moves for substitution of appointed counsel based on an irreconcilable conflict with counsel, so it is doubtful that the mere failure to make an adequate inquiry into the claimed conflict could support habeas relief because the AEDPA requires this court to evaluate the state court's decision with reference only to "clearly established Federal law, as determined by the Supreme Court of the United

---

[4] The term "conflict of interest" is a term of art that ordinarily "denotes representation of multiple conflicting interests, such as an attorney's representation of more than one defendant in the same criminal case, or representation of a defendant where the attorney is being prosecuted for related crimes." *See Stenson v. Lambert*, 504 F.3d 873, 886 (9th Cir. 2007). That sort of conflict could be the basis for a motion for substitution of counsel. There also is another kind of conflict, usually pertaining to the conduct of the defense or trial strategy, that is referred to as an "irreconcilable conflict" between attorney and client that gives rise to many motions to substitute counsel. *See id.* It is this latter sort of perceived irreconcilable conflict that prompted Mr. Mitchell's *Marsden* motions.

United States District Court
For the Northern District of California

1   States," 28 U.S.C. § 2254(d)(1).  In any event, the superior court did conduct adequate inquiries

2   into Mr. Mitchell's concerns about his appointed counsel.  *See Hudson v. Rushen*, 686 F.2d 826,

3   831 (9th Cir. 1982) (state court conducted adequate hearing when it invited defendant to make a

4   statement and listened to defendant's reasons for wanting new counsel).  The superior court made

5   a thorough inquiry into each of Mr. Mitchell's several *Marsden* motions.  *See* Docket No. 33-1

6   (11/22/05 *Marsden* hearing transcript); Docket No. 33-2 (12/12/05 *Marsden* hearing transcript);

7   Docket No. 33-3 (1/3/06 *Marsden* hearing transcript). [5] At each hearing, the superior court

8   allowed Mr. Mitchell to voice all his concerns about counsel's alleged shortcomings and then

9   allowed attorney Thomas to respond to those concerns, asking follow-up questions as needed to

10   clarify information.  A separate hearing was not held after Mr. Mitchell sent a letter seeking

11   reconsideration a few days after the denial of the second *Marsden* motion, but the superior court

12   gave an adequate reason on the record: no hearing was needed because the letter did not raise any

13   new information that had developed since the denial of the most recent *Marsden* motion.  *See*

14   Docket No. 32-2 at 16-17 (RT 147-49).  Additionally, as the state appellate court noted, Mr.

15   Mitchell was given an opportunity to raise his issues in the next *Marsden* hearing about ten days

16

17   _____

17   [5] Some of the pages in the transcripts of the *Marsden* hearings were redacted.  The Court requested

18   Respondent to supplement the record with unredacted copies of the pages that had been redacted.
     Docket No. 35.  Respondent then filed a response to that request demonstrating that Respondent

19   did not have the unredacted pages and could not obtain them without a court order from the
     California Court of Appeal.

20
     Respondent demonstrated that, at the same time he filed his Appellant's Opening Brief in
21   the California Court of Appeal asserting the claim that the *Marsden* motions had been wrongly
     denied, Mr. Mitchell's appellate counsel had filed a motion in the California Court of Appeal to
22   keep those portions of the *Marsden* transcripts "sealed as they contain confidential information not
     relevant to the issues on appeal."  Docket No. 36-1 at 3.  The California Court of Appeal found
23   good cause to grant the motion to keep portions of the *Marsden* transcripts sealed, and ordered a
     redacted copy of the transcripts transmitted to Respondent.  *See* Docket No. 36 at 2.  Respondent
24   explained to this Court that an unredacted copy of the redacted pages could not be obtained
     without an order from the California Court of Appeal.

25
     Respondent also pointed out that the California Court of Appeal did not rely on the
26   redacted portions of the *Marsden* transcripts in ruling on the claim on direct appeal.  This Court
     agrees with Respondent's contention that this Court should not consider the redacted portion of
27   the *Marsden* transcripts because the California Court of Appeal did not rely on them. *See Holland
     v. Jackson,* 542 U.S. 649, 651-53 (2004) (per curiam) (error to grant relief in disregard of state
28   court's statement that certain evidence was not properly before it).  Accordingly, this Court
     decides the claim without using the redacted portions of the *Marsden* transcripts.

1   later.

2      The California Court of Appeal reasonably rejected the claim that Mr. Mitchell's Sixth

3   Amendment right was violated due to an irreconcilable breakdown in the relationship between

4   attorney and client requiring substitution of counsel.

5      Mr. Mitchell's primary frustration was that Ms. Thomas would not have a *contact* visit

6   with him.  Mr. Mitchell fails to show that the other alternative means of communication were

7   inadequate for him to communicate with Ms. Thomas.  Mr. Mitchell simply did not want to utilize

8   another method, as is shown by his responses to the other offered methods.  First, Ms. Thomas met

9   with Mr. Mitchell in the visiting room three days after the first *Marsden* hearing, and they spoke

10  through a partition that divided inmates from visitors.  To alleviate Mr. Mitchell's worries that

11  someone might be eavesdropping on their communications in the visiting room, Ms. Thomas told

12  Mr. Mitchell that he could write his information on a piece of paper and hold it up to the partition

13  for her to read.  He did not agree to this method of communication.  Second, after the court session

14  on December 22, 2005, counsel offered to meet Mr. Mitchell in the jail upstairs from the

15  courtroom, where they could have a meeting that was "essentially a contact meeting" and where

16  they "would not be heard."  Docket No. 33-3 at 4 (RT 168).  Mr. Mitchell did not agree and

17  instead decided he would rather return to the Santa Rita Jail on the early bus.  (*Id.*)  Third, counsel

18  sent to Mr. Mitchell paper and stamped envelopes so Mr. Mitchell could send her letters, but Mr.

19  Mitchell rejected written communication, professing to be "semi-illiterate."  *See* Docket No. 33-2

20  at 11 (12/12/05 RT 8). Yet Mr. Mitchell was a high school graduate, *see* CT 1107; cogently

21  argued his *Marsden* requests; and had handwritten a four-page letter to the judge requesting that

22  the judge reconsider an earlier *Marsden* decision.  *See* Docket No. 17-1 at 45-48.  Especially

23  having Mr. Mitchell's handwritten letter in front of him, the judge rightly gave little weight to any

24  suggestion by Mr. Mitchell that he could not communicate in writing.  Fourth, when Mr. Mitchell

25  refused to meet with Ms. Thomas at the jail upstairs from the courtroom on December 22, 2005,

26  she "told him if [she] came out to Santa Rita [Jail], it would not be a contact visit," to which he

27  responded that she should not come to Santa Rita Jail.  RT 168.  Even though Ms. Thomas told

28  Mr. Mitchell she would not travel to Santa Rita Jail to have a contact visit, she actually did try to

**United States District Court**
For the Northern District of California

set one up.  Ms. Thomas was unable to set up a contact visit at the Santa Rita Jail due to her inability to reach someone at the jail who would set up the visit in a timely manner.  RT 169-170.

The California Court of Appeal pointed out that there is no specific number of meetings that must be held between an attorney and client before trial.  As that court reasonably determined, more meetings might have been better, but Mr. Mitchell had an opportunity to discuss his case with Ms. Mitchell and could have made better use of the time that his counsel did have to talk with him.  The record amply supports a determination that Mr. Mitchell's behavior and unrealistic demands for a contact visit were the real cause of any shortfall in the communications between him and Ms. Thomas.  The Sixth Amendment is not violated when a defendant is represented by a lawyer free of actual conflicts of interest, but with whom the defendant refuses to cooperate because of dislike or distrust.  *Plumlee v. Masto*, 512 F.3d 1204, 1211 (9th Cir. 2008); *see Larson v. Palmateer,* 515 F.3d 1057, 1067 (9th Cir. 2008) (no relief under AEDPA for defendant who did not argue counsel had either an actual or apparent conflict of interest, and instead complained only about lack of communication with counsel and counsel's strategic decisions, including not making motions defendant requested, contacting witnesses without defendant's consent, and not providing defendant with a defense witness list for his approval): *see generally Schell v. Witek*, 218 F.3d at 1026 (suggesting that Sixth Amendment violation would not occur if the conflict between counsel and client was of the client's own making); *Crandell v. Bunnell*, 144 F.3d 1213, 1218 (9th Cir. 1998) (pre-AEDPA case) ("had the magistrate judge found that the [criminal defendant] sabotaged the relationship or failed to make reasonable efforts to develop the relationship . . . then the ruling today might be different" from the order granting relief where counsel was plainly deficient), *overruled on other grounds by Schell v. Witek*, 218 F.3d 1017 (9th Cir. 2000).

In the *Marsden* hearings, Mr. Mitchell faulted counsel for not talking to him about his case, but the record shows that Mr. Mitchell and Ms. Thomas did talk about the case and Ms. Thomas also had a lot of information about the case based on materials in the case file obtained from attorney Lang, who earlier had communicated with Mr. Mitchell about the case.  Mr. Mitchell and Ms. Thomas communicated about potential defense motions, and Mr. Mitchell was dismayed by Ms. Thomas' view of the likely futility of certain motions he wanted her to make.

23

**United States District Court**
For the Northern District of California

1   Ms. Thomas explained at the second *Marsden* hearing the various motions and strategies she had

2   discussed with Mr. Mitchell.  Mr. Mitchell wanted a suppression motion filed, but Ms. Thomas

3   thought the motion would fail because the apartment had been searched with a valid consent from

4   the resident or owner of the apartment.  Mr. Mitchell wanted *Pitchess* motions filed to obtain

5   personnel records of all law enforcement officers who had contact with a van in which his DNA

6   was found to support his theory that the DNA evidence had been planted.  Ms. Thomas explained

7   that there were numerous law enforcement people involved and Mr. Mitchell could not identify

8   any one of them who had reason to plant evidence against him; more importantly, regardless of the

9   DNA evidence, Mr. Mitchell had been identified by "civilian" witnesses as the carjacker.  Mr.

10  Mitchell apparently wanted a DNA expert, and Ms. Thomas explained that Mr. Mitchell's desire

11  for an expert to challenge the DNA evidence was inconsistent with Mr. Mitchell's insistence that

12  the DNA had been "planted," because an argument that DNA evidence has been "planted"

13  generally concedes that the DNA is a defendant's DNA.    Mr. Mitchell apparently wanted counsel

14  to search for alibi and other witnesses, but apparently gave her incomplete identifying information

15  such that finding the witnesses would be very difficult.  Also, Ms. Thomas intimated that the

16  expected information from the witnesses would not be helpful to Mr. Mitchell's defense, although

17  the transcript is less than clear on her reasoning.  Ms. Thomas also explained to the court that,

18  after talking to Mr. Mitchell, she contacted Mr. Mitchell's prior attorney, Mr. Lang, who told her

19  that he had gone over these same points with Mr. Mitchell, and Mr. Mitchell was dismayed with

20  his analysis as well.  Ms. Thomas told the superior court that she was the messenger with the bad

21  news for the client.  The superior court accepted counsel's explanations as reasonable ones.  *See*

22  Docket No. 33-2 (12/12/05 *Marsden* hearing transcript).

23          The record shows that Mr. Mitchell refused to cede to the lawyer's judgment on legal

24  questions and matters of trial strategy, if he disagreed with it.  A client's erroneous view of the law

25  that counsel does not accept does not provide a sufficient reason to discharge counsel.  The

26  client's unwillingness to let the lawyer make tactical determinations is not a legitimate reason to

27  compel appointment of new counsel.  *See Schell v. Witek*, 218 F.3d at 1026 & n.8.

28  "Disagreements over strategical or tactical decisions do not rise to [the] level of a complete

24

United States District Court
For the Northern District of California

1    breakdown in communication" that amounts to a Sixth Amendment violation. *Stenson v. Lambert*,

2    504 F.3d at 886 (citing *Schell*, 218 F.3d at 1026).

3          Further, counsel was working under tight time constraints.  Mr. Mitchell was under a no-

4    time-waiver and his trial had to start by December 15, 2005 for speedy trial purposes.  Ms.

5    Thomas was appointed less than two months before trial was set to start, and received a file with

6    about 2,000 pages of material six weeks before trial was set to start.  Ms. Thomas explained to the

7    superior court that she had a lot of documents to review, had to make witness files, and had to

8    prepare motions in limine and jury instructions.  Her efforts to prepare for trial were being

9    hindered by a client who refused to engage in any sort of communications other than a contact

10   visit.  Also, there were no plea negotiations to discuss with the client because the prosecutor

11   "ha[d] not made an offer and steadfastly refuse[d] to make an offer" as of December 12, 2005.

12   Docket No. 33-2 at 23 (12/12/05 RT 20).

13         Mr. Mitchell argued on appeal that the superior court exceeded the bounds of law and

14   reason when it rejected his *Marsden* motions as "premature."  Mitchell misunderstood the judge's

15   comment.  In context, the comment meant that there was still time for the attorney to prepare the

16   case *and* communicate with Mitchell.  Contrary to Mitchell's intimation, the trial judge was not

17   suggesting that a *Marsden* motion could not be made until after trial.  That the trial judge did not

18   reject the motion for the procedural reason that it was unripe is evident from the fact that the judge

19   discussed the merits of Mr. Mitchell's complaints about counsel.  When the trial court commented

20   that the motion was "premature," the essence of the message was there was still time to

21   accomplish the things the criminal defendant was faulting counsel for not doing, rather than that

22   the court would not entertain the motion because it was too early in the proceedings for a criminal

23   defendant to ever make such a motion.  *See, e.g.,* 11/22/05 RT at 11, 15 (trial court states that,

24   since Ms. Thomas first received the case file with 2,000 pages three weeks ago, "she had been

25   working on that, and that's what she should be doing.  I will agree with you that it would be nice if

26   she would come out and see you, so you guys could have a sit down, and you can tell her -- from

27   your standpoint you can give her information that she can follow up on, and I think that needs to

28   be done right away.  That sit down needs to take place so that she can get to work on that, and we

**United States District Court**
For the Northern District of California

1   can revisit this if we need to down the line a little bit, but I just think that the motion is a *little*

2   *premature* right now because of the timing."); Docket No. 32-2 at 31 (12/22/05 hearing at which

3   Mr. Mitchell complains he has not had a consultation with his attorney; judge responds that the

4   next court day is "almost two weeks away, so this may be premature"); Docket No. 33-3 at 10

5   (1/3/06 *Marsden* hearing ends with judge noting that the prosecution's case is "about to start," and

6   the defense case will  not start for at least two weeks, "so there's still time to consult on what you

7   might say if you were to say something.")

8         In light of the evidence presented at the *Marsden* hearings, the trial court could reasonably

9   think that Mr. Mitchell's claimed conflict with counsel was almost completely due to his stubborn

10  insistence that she meet with him in person for a contact visit and Mr. Mitchell's disagreement

11  with Ms. Thomas' strategic decisions about the futility of certain motions he wanted presented.

12  Bearing in mind that the "purpose of providing assistance of counsel 'is simply to ensure that

13  criminal defendants receive a fair trial,'" *Wheat,* 486 U.S. at 159, it was not unreasonable for the

14  California Court of Appeal to determine that that purpose was fulfilled in this case and that no

15  Sixth Amendment violation occurred.  The California Court of Appeal's rejection of Mr.

16  Mitchell's claim was neither contrary to nor an unreasonable application of clearly established

17  federal law as set forth by the U.S. Supreme Court.  Mr. Mitchell is not entitled to the writ on this

18  claim.

19  D.    No Certificate of Appealability

20        A certificate of appealability will not issue.  *See* 28 U.S.C. § 2253(c).  This is not a case in

21  which "reasonable jurists would find the district court's assessment of the constitutional claims

22  debatable or wrong." *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).  Accordingly, a certificate of

23  appealability is **DENIED**.

24  ///

25  ///

26  ///

27  ///

28  ///

# VI.    CONCLUSION

For the foregoing reasons, the petition for writ of habeas corpus is **DENIED** on the merits. The Clerk shall close the file.

**IT IS SO ORDERED**.

Dated: January 9, 2017

_____
EDWARD M. CHEN
United States District Judge